**In the Matter of Anibal
DeJESUS, Debtor.**

**Bankruptcy No. 99–14723JHW.**

United States Bankruptcy Court,
D. New Jersey.

Oct. 21, 1999.

Eric Clayman, Jenkins & Clayman, Haddon Heights, NJ, for Debtor.

Steven L. Scher, Deputy Attorney General, Trenton, NJ, for Division of Motor Vehicles.

## OPINION

JUDITH H. WIZMUR, Bankruptcy Judge.

Before this court for resolution is the Chapter 13 debtor's challenge to the priority claim filed by the New Jersey Division of Motor Vehicles ("DMV"), based on a motor vehicle surcharge. The debtor seeks to reclassify the DMV's claim as a general unsecured claim. The issue presented is whether the surcharge constitutes an "excise tax" for purposes of 11 U.S.C. § 507(a)(8)(E), requiring payment in full as a priority claim under 11 U.S.C. § 1322(a)(2).

The debtor filed his Chapter 13 case on May 18, 1999. His plan contemplates the payment of $75.00 per month, representing debtor's monthly disposable income, for 36 months, to pay Chapter 13 attorney's fees, a municipal court fine, and a pro rata dividend to general unsecured creditors, including the DMV. The DMV filed its claim for $4,803.56 as a priority claim on October 20, 1999. The debtor filed an objection to the claim on November 3, 1999.

The debtor contends that a motor vehicle surcharge is not an excise tax, but rather a civil penalty, the assessment of which is a consequence of violating certain motor vehicle laws, such as drunk driving or driving without insurance. The DMV characterizes the surcharge as an excise tax, reciting the four-prong test articulated in such cases as *In re Cassidy,* 983 F.2d 161, 163 (10th Cir.1992) and *Williams v. Motley,* 925 F.2d 741 (4th Cir.1991) to reflect that, like every excise tax, the surcharge is an involuntary pecuniary burden imposed by the state legislature, under the police or taxing power of the state, for public purposes.

## I. The "excise tax" as a priority claim under the Bankruptcy Code.

This discussion necessarily begins with the statute. 11 U.S.C. § 507(a)(8)(E) provides:

(a) The following expenses and claims have priority in the following order:

. . .

(8) Eighth, allowed unsecured claims of governmental units, only to the extent that such claims are for—

. . .

(E) an excise tax on—

(i) a transaction occurring before the date of the filing of the petition for which a return, if required, is last due, under applicable law or under any extension, after three years before the date of the filing of the petition; or

(ii) if a return is not required, a transaction occurring during the three years immediately preceding the date of the filing of the petition.

The term "excise tax" is not defined in the Bankruptcy Code. The legislative history contains an explanation of the term that "[a]ll Federal, State or local taxes generally considered or expressly treated as excises are covered by this category, including sales taxes, estate and gift taxes, gasoline and special fuel taxes and wagering and truck taxes." 124 Cong. Rec. H11113 (daily ed. Sept. 28, 1978); S17430 (daily ed. Oct. 6, 1978); remarks of Rep. Edwards

and Sen. Deconcini. An excise tax is commonly defined as a

> tax imposed on the performance of an act, the engaging in an occupation, or the enjoyment of a privilege. A tax on the manufacture, sale, or use of goods or on the carrying on of an occupation or activity, or a tax on the transfer of property. In current usage the term has been extended to include various license fees and practically every internal revenue tax except the income tax.

BLACK'S LAW DICTIONARY at 563 (Deluxe 6th Ed.1990). *See In re Kish,* 238 B.R. 271, 288 (Bankr.D.N.J.1999).

■■■ Whether the motor vehicle surcharge in New Jersey is an excise tax entitled to priority within the meaning of the Bankruptcy Code is a federal question. *City of New York v. Feiring,* 313 U.S. 283, 285, 61 S.Ct. 1028, 1029, 85 L.Ed. 1333 (1941). Where, as here, the surcharge is created and defined by state enactment, we must review state law to ascertain whether the incidents of the exaction are such as to constitute a tax within the meaning of the Code. *Id. See also In re Nejberger,* 934 F.2d 1300, 1302 (3d Cir. 1991) ("[W]hile state law creates legal interests and defines their incidents, the ultimate question whether an interest thus created and defined falls within a category stated by a Federal statute, requires an interpretation of that statute, which is a Federal question.") (internal quotations omitted).

The guiding analytical framework to determine whether the surcharge is an excise tax is provided by the Supreme Court in *United States v. Reorganized CF & I Fabricators of Utah, Inc.,* 518 U.S. 213, 116 S.Ct. 2106, 135 L.Ed.2d 506 (1996). In *Reorganized CF & I Fabricators,* the Supreme Court considered whether the Internal Revenue Service ("IRS") was entitled to excise tax priority status under

§ 507(a)(7)(E), now (a)(8)(E) [1], for a 10% "tax" imposed upon the debtor employer as a consequence of funding deficiencies in the debtor's sponsored employee pension plans. Concluding that the "tax" imposed by the Internal Revenue Code was a penalty rather than an excise tax, the Court denied the IRS a priority position under § 507(a)(7)(E).

The debtor, CF & I Steel Corp., was required under federal law to make certain annual minimum funding contributions to two pension plans that it sponsored for its employees. The debtor's inability to make these contributions led them to file for relief under Chapter 11 of the Bankruptcy Code. The IRS filed several proofs of claim, including a claim for a 10% tax levied on the accumulating deficiency in the pension plans pursuant to 26 U.S.C. § 4971(a). The Government sought a priority for its claim under sections 507(a)(7)(E) and (a)(7)(G). The bankruptcy court rejected the priority status of the IRS claim, and the district court and the Tenth Circuit affirmed.

In affirming the position of the lower courts that the 10% "tax" is not a priority excise tax under the Bankruptcy Code, the Supreme Court looked beyond the statutory designation of the exaction as a "tax", embarking instead on a functional examination to determine "whether [the] exaction was a tax ... or a penalty or debt." 518 U.S. at 214, 116 S.Ct. at 2113. Earlier Supreme Court cases, including *New Jersey v. Anderson,* 203 U.S. 483, 492, 27 S.Ct. 137, 140, 51 L.Ed. 284 (1906) and *City of New York v. Feiring, supra,* defined a tax as "a pecuniary burden laid upon individuals or property for the purpose of supporting the Government." *Anderson,* 203 U.S. at 492, 27 S.Ct. at 140; *Feiring,* 313 U.S. at 285, 61 S.Ct. at 1029.

The *CF & I* Court juxtaposed an excise tax and a penalty, explaining that " '[a] tax

---

**1.** "Section 304(c) of the Bankruptcy Reform Act of 1994, 108 Stat. 4132, added a new seventh priority and moved the provision relevant here from seventh (§ 507(a)(7)) to eighth

priority." *United States v. Reorganized CF & I Fabricators,* 518 U.S. at 216 n. 1, 116 S.Ct. at 2109 n. 1.

is an enforced contribution to provide for the support of government; a penalty, as the word is here used, is an exaction imposed by statute as punishment for an unlawful act.'" 518 U.S. at 224, 116 S.Ct. at 2113 (quoting *United States v. La Franca*, 282 U.S. 568, 572, 51 S.Ct. 278, 280, 75 L.Ed. 551 (1931)). Explaining that "if the concept of penalty means anything, it means punishment for an unlawful act or omission," the Court determined that the 10% tax provided for by § 4971 is actually a penalty rather than an excise tax because the exaction is imposed as the consequence of the employer's violation of the federal law. *Id.* Under the statutory framework, an employer is required to fund pension plans fully. 29 U.S.C. § 1082. Section 4971 imposes a 10% additional exaction for a deficiency in the minimum annual funding, which constitutes a violation of the statute requiring full funding. As further support for the penal nature of the exaction, the Court noted the independent claim statutorily given to the Pension Benefit Guaranty Corporation against an employer who fails to properly fund an employee pension plan. *Id.*, 116 S.Ct. at 2113–14. The Court was "unable to find any provision in the statutory scheme that would cast the 'tax' at issue here in anything but [a] punitive light." *Id.* at 225, 116 S.Ct. at 2114. "Given the patently punitive function of § 4971", the Court held "that § 4971 must be treated as imposing a penalty, not authorizing a tax. Accordingly, ... the 'tax' under § 4971(a) was not entitled to seventh priority as an 'excise tax' under § 507(a)(7)(E), but instead is, for bankruptcy purposes, a penalty to be dealt with as an ordinary, unsecured claim." *Id.* at 226, 116 S.Ct. at 2114.

Following *Reorganized CF & I Fabricators*, various courts have examined assessments in different contexts to determine whether the assessment is functionally a penalty or a tax. *See, e.g., In re Juvenile Shoe Corp. of America*, 99 F.3d 898 (8th Cir.1996) (the flat tax levied by Congress on funds reverting to the employer from an over funded pension plan is an excise tax rather than a penalty because the reversion is not prohibited by federal law and the tax recaptures revenue lost by the government); *In re Mounier*, 232 B.R. 186 (Bankr.S.D.Cal.1998) (ten percent assessment on early withdrawal of retirement account is a penalty and not a tax for purposes of 11 U.S.C. § 523(a)(1)); *In re Appugliese*, 210 B.R. 890 (Bankr.D.Mass. 1997) (motor vehicle registration tax was a tax not a penalty). *See also Workers' Compensation Trust Fund v. Saunders*, 234 B.R. 555 (D.Mass.1999).

In *Saunders*, the court characterized the Supreme Court's approach to determining excise tax status in *CF & I* as "whether the exaction (1) meets the general description of a tax and (2) possesses other 'tax characteristics,' such that the exaction operates as a ' "tax" (as distinct from a debt or penalty) for the purpose of setting the priority of a claim under the bankruptcy laws.'" 234 B.R. at 564 (citation and footnote omitted). The tax characteristics may refer to both the levying or imposition of the tax and the collection or enforcement of the tax levied. *Id.* at n. 11. In *CF & I*, although the exaction in question, a 10% "tax" imposed for a deficiency in the required funding of pension plans, met the general description of a "tax", the exaction was not a tax because the *CF & I* Court concluded that the "penal nature of the exaction alone was a sufficient non-tax characteristic to disqualify the exaction as a tax." *Id.* at 565.

> This approach—the determination of whether the non-tax characteristics predominate over the tax characteristics—appears to have been a necessary refinement of the *Anderson* tax definition because the exaction in *CF & I* had both tax and non-tax characteristics.

*Id.* at n. 12.

The cases cited above that have contrasted a tax and a penalty have consistently determined, where an exaction imposed by statute is a consequence of an

unlawful act by the person or entity upon whom the exaction is imposed, that the penal nature of the exaction disqualifies the exaction from being characterized as a tax. For instance, in *CF & I*, the employer violated the federal statutory requirement of annual minimum funding for its pension plans. In contrast, in *Juvenile Shoe*, an employer who received reverted funds from an over funded pension plan did not violate a law, and was required to pay a "tax" rather than a "penalty" as a consequence of the transaction.[2]

## II. New Jersey Motor Vehicle Surcharge.

The incidents of a motor vehicle surcharge under New Jersey law must be reviewed to determine whether the New Jersey motor vehicle surcharge is a tax or a penalty.

Prior to the enactment of the Insurance Reform Act of 1982, N.J.S.A. 17:29A–33 to –47, "an individual convicted of a drunken driving offense was subject to criminal penalties imposed by the State including fines, points on the license, license suspension or revocation, or imprisonment." *Marks v. Snedeker*, 612 F.Supp. 1158, 1159 (D.N.J.1985). "In addition to these criminal penalties, a driver would almost inevitably be required, by his or her insurance carrier, to pay an insurance surcharge for a period of three years." *Id.* See also *State v. Bigham*, 119 N.J. 646, 652, 575 A.2d 868 (1990) ("incremental insurance costs in the form of surcharges were imposed by private insurers on drivers in both the voluntary and residual markets"). The result was that surcharges were being levied "in a seemingly ad hoc manner, with the amount often based on company-set percentages of base insurance premium rates. Those rates in turn were based on

driver classification or geographical location." *State v. Bigham*, 119 N.J. 646, 652, 575 A.2d 868 (1990). "'[S]ome companies surcharge[d] in the voluntary market for very minor violations and accidents, and others charge[d] only for major violations and accidents.'" *Id.* at 653 (quoting Ad Hoc Committee Report on Automobile Insurance Reform in the State of New Jersey, Chairman's Report, 23–24 (January 3, 1979)). In addition, "drivers throughout New Jersey were often unable to obtain insurance coverage, despite a good driving record, due to the perceived lack of profitability for insurance carriers in New Jersey." *Marks*, 612 F.Supp. at 1159. See also *In re Adams*, 106 B.R. 811, 817–18 (Bankr.D.N.J.1989) (reviewing the *Marks* analysis).

"The surcharge scheme of the Merit Rating Plan was designed [in part] ... to alleviate disparate surcharges by implementing a uniform dollar scale to be levied for violations of motor-vehicle laws." *Bigham*, 119 N.J. at 653, 575 A.2d 868. The Merit Rating Plan transferred to the Division of Motor Vehicles "the responsibility of assessing surcharges for high risk drivers in a uniform manner, as opposed to the area-based industry surcharge previously in existence. The law establishe[d] an industry surcharge system based upon an individual's driving history and set[ ] qualifications for the offender's continued driving on the highway." *Clark v. New Jersey DMV*, 211 N.J.Super. 708, 710–11 (App. Div.1986). The Act did "'not create new surcharges for motor vehicle convictions and accidents; it reform[ed] the surcharge system previously used by the insurance companies.'" *Bigham*, 119 N.J. at 654, 575 A.2d 868 (quoting Karcher, Overview of No–Fault Auto Insurance, 111 N.J.L. 9

---

**2.** In *Saunders*, in which case the court held that the assessment in question was a penalty rather than a tax, the assessment arose from the employer's violation of the statutory requirement to maintain worker's compensation insurance. However, the court did not focus on the fact that the assessment was a consequence of a state law violation. Rather, the court focused on the "non-tax characteristic" of the assessment that, unlike a tax, the assessment was discretionary with the Worker's Compensation Trust Fund, with no guidance as to when the assessment should be imposed upon a qualifying employer. *Saunders*, 234 B.R. at 565.

(May 1985)). *See also McGarrah v. State,* 268 N.J.Super. 577, 581, 634 A.2d 139 (App.Div.), *certif. denied,* 135 N.J. 469, 640 A.2d 850 (1994) ("The insurance surcharges imposed pursuant to N.J.S.A. 17:29A–35(b) are modeled on those previously assessed by the private insurance industry.").

Surcharges are now "assessed for motor vehicle offenses which involve dangerous driving practices and driver irresponsibility," *McGarrah,* 268 N.J.Super. at 581–82, 634 A.2d 139, including: "driving while suspended, for failure to maintain liability insurance on a motor vehicle or motorized bicycle, for any motor-vehicle violation resulting in a fatality, for drunk driving or refusal to submit to a chemical test in another jurisdiction, and also for driving on an expired license." 119 N.J. at 659. *See* N.J.S.A. 17:29A–35b; N.J.A.C. 13:19–13.1, –13.2. New Jersey's policy is such that "those who violate the traffic safety laws [are] financially responsible for the increased costs of insurance . . . [The] central idea [is] that significant motor vehicle offenses should be deemed the basis for the imposition of an insurance surcharge." *Id.* at 655.

New Jersey case law has characterized motor vehicle surcharges as civil penalties. In *Clark v. New Jersey Div. of Motor Vehicles,* 211 N.J.Super. 708, 711, 512 A.2d 588 (App.Div.1986), in the context of determining that the statute assessing insurance surcharges did not violate federal or state constitutional prohibitions against *ex post facto* laws, the New Jersey Superior Court Appellate Division labeled surcharges as a "statutory system of civil penalties," noting that "the purpose and effect of the Merit Rating Plan surcharges are clearly remedial and civil."[3] *See also In re Kish,* 238 B.R. 271, 284 (Bankr. D.N.J.1999) ("courts within this district that have recently considered the dis-

chargeability of motor vehicle surcharges have expressly held that the surcharges are civil penalties"); *In re Curtin,* 206 B.R. 694, 696 (Bankr.D.N.J.1996); *In re Kent,* 190 B.R. 196, 202 (Bankr.D.N.J. 1995) (the surcharge constitutes a "penalty" for § 523(a)(7) purposes because it is an assessment which must be paid as a consequence of violations of certain motor vehicle laws); *In re Bill,* 90 B.R. 651, 655 (Bankr.D.N.J.1988) (the surcharge is a penalty imposed to supplement the JUA); *Clark v. Clark,* 324 N.J.Super. 587, 592, 737 A.2d 189 (Ch.Div.1999) ("the surcharge is a civil penalty").

If a New Jersey driver upon whom a surcharge has been levied fails to pay the surcharge,

> the license of the driver shall be suspended forthwith until the surcharge is paid to the Division of Motor Vehicles; except that the Division of Motor Vehicles may authorize payment of the surcharge on an installment basis over a period not to exceed 12 months. If a driver fails to pay the surcharge or any installments on the surcharge, the total surcharge shall become due immediately.

N.J.S.A. 17:29A–35(b)(2). The suspension of driving privileges for failure to pay the surcharge is mandatory. From 1983 to 1994, the only consequence of failure to pay the surcharge was the suspension of driving privileges. *See* L.1994, c. 64, § 1 (amending N.J.S.A. 17:29A–35 to enhance surcharge collection methods).

As an additional collection remedy, added as an option by the legislature in 1994, the director of the DMV "may issue a certificate to the clerk of the Superior Court," which is recorded as a docketed judgment and "has the same force and effect as a civil judgment," affording to the director all collection remedies against the

---

3. In *Clark,* the court juxtaposed civil penalties with criminal penalties, concluding that the motor vehicle surcharge is "not punitive in nature and not proscribed under the *ex post facto* provision of the state and federal consti-

tutions," 211 N.J.Super. at 711, 512 A.2d 588, but is a civil penalty, in that a violator "must pay a monetary assessment in accordance with a uniform schedule for the privilege of driving on the highways." *Id.*

debtor. N.J.S.A. 17:29A–35 (as amended by L.1994, c. 64, § 1). The filing of the certificate for the pursuit of the collection of a civil judgment is discretionary, and the statute provides no guidance to the director as to when such collection efforts should be pursued. Appeals of the Director's determination of surcharge assessments are taken to the New Jersey Superior Court, Appellate Division. *See* N.J.Ct.R. 2:2–3.

In contrast, the State Tax Uniform Procedure Law, N.J.S.A. 54:48–1 through 54:53–17, provides uniform remedies and procedures in imposing assessments and collecting state tax debts. The tax collection law applies to any "state tax", defined as "any tax which is payable to or collectible by the state tax commissioner." N.J.S.A. 54:48–2.[4] Under the Uniform Procedures Act, the Director of the Division of Taxation has the authority to make assessments, by estimating or direct review of returns, and to provide notice and a demand for payment. N.J.S.A. 54:49–5, –6, –7. *See also* N.J.S.A. 54:32B–19 (imposing assessments under the Sales and Use Tax Act). Appeals of the Director's decisions are taken to the New Jersey Tax Court. N.J.S.A. 54:51A–13. *See also* N.J.S.A. 54:32B–21. If the state tax is not paid, penalties and interest are automatically assessed. N.J.S.A. 54:49–3, –4. As an additional remedy, the Director may issue a certification of debt to the Clerk of the Superior Court, stating the name of the applicable state tax and the amount of the deficiency, which is docketed on the record of docketed judgments and has the same effect and force of a judgment in an action. N.J.S.A. 54:49–12. As a further remedy, the Director may issue a warrant to the appropriate county sheriff to levy upon and sell the real and personal property of

the taxpayer. N.J.S.A. 54:49–13a. The sheriff shall also file the warrant with the county clerk to be entered as a judgment, which becomes a lien on the taxpayer's property. *Id. See also* N.J.S.A. 54:32B–22(b).

The revenues generated from motor vehicle surcharges have contributed to fund a complex system of insuring high-risk New Jersey drivers, first through the New Jersey Full Insurance Underwriting Association, or Joint Underwriting Association ("JUA"), and then through the JUA's successor, the Market Transition Facility ("MTF"). The use of the surcharge monies "have been limited to the payment of claims against the JUA or MTF, payoff of the JUA or MTF deficits, and/or retirement of the bonds issued to pay JUA or MTF claims." *In re Kish,* 238 B.R. 271, 280 (Bankr.D.N.J.1999).

III. DMV's Arguments.

A. The *Lorber* Test.

▪ The DMV contends that the New Jersey motor vehicle surcharge is an excise tax because the surcharge exhibits each of the characteristics of a tax, as reflected in the oft-cited Ninth Circuit case of *In re Lorber Indus. of Cal., Inc.,* 675 F.2d 1062, 1066 (9th Cir.1982). The *Lorber* test, which is an expansion of the Supreme Court's articulation in *Anderson* and *Feiring*[5] of the characteristics of a tax, requires a demonstration that the exaction in question is:

(1) an involuntary pecuniary burden, regardless of name, laid upon individuals or property;

(2) imposed by, or under authority of the legislature;

(3) for public purposes, including the purposes of defraying expenses of gov-

---

4. Note that surcharges are payable to and collected by the Division of Motor Vehicles and not the state tax commissioner. N.J.S.A. 17:29A–35(b)(2).

5. As noted above, *Feiring* described a tax as a "pecuniary burde[n] laid upon individuals or

their property, regardless of their consent, for the purpose of defraying the expenses of government or of undertakings authorized by it." *Feiring,* 313 U.S. at 285, 61 S.Ct. at 1029. *See also Anderson,* 203 U.S. at 492, 27 S.Ct. at 140.

ernment of undertakings authorized by it; and

(4) under the police of taxing power of the state.

*Id.*[6] *See also In re Cassidy,* 983 F.2d 161, 163 (10th Cir.1992).

The DMV directs our attention to the application of the *Lorber* test in the Fourth Circuit's decision in *Williams v. Motley,* 925 F.2d 741 (4th Cir.1991), the Ninth Circuit's decision in *In re Camilli,* 94 F.3d 1330 (9th Cir.1996), *cert. denied,* 519 U.S. 1113, 117 S.Ct. 953, 136 L.Ed.2d 840 (1997), and the Eighth Circuit Bankruptcy Appellate Panel's decision in *In re Voightman,* 239 B.R. 380 (8th Cir. BAP 1999). In each of these cases, the court determined that the exaction at issue met the four-prong *Lorber* test, and qualified as an excise tax entitled to priority under § 507(a)(8)(E).

In *Williams,* the Fourth Circuit reviewed the imposition of an uninsured motor vehicle assessment on drivers who operate uninsured vehicles in Virginia. The Commonwealth of Virginia does not mandate liability insurance coverage, but does require that an individual pay an uninsured motor vehicle assessment in order to operate an uninsured vehicle. 925 F.2d at 742–43. The court focused on the voluntariness of the assessment, and whether the assessment served a public purpose. As to voluntariness, the court distinguished between a fee, which is a charge exacted by a public agency to engage in a voluntary activity, and a tax, which is an involuntary exaction. The court labeled the assessment as an involuntary assessment. As to public purpose, the court determined that such a purpose was exhibited by the assessment, because the assessment sought to encourage drivers to obtain uninsured motorist insurance cover-

age, thereby compensating injured parties who are not at fault and who cannot afford to bear the loss. *Id.* at 744.

In *Camilli,* the debtor sought to discharge her obligation to reimburse the Industrial Commission of Arizona for workers' compensation benefits that the Commission paid to the debtor's employee. The Commission paid the benefits when the debtor failed to obtain workers' compensation insurance, in violation of state law. The Bankruptcy Appellate Panel concluded that the obligation was not a tax but only a fee, in part because "Camilli made a 'voluntary' decision to violate state law when she failed to insure her employees." 94 F.3d at 1331. The Ninth Circuit disagreed.

Applying the four-prong test, the Circuit determined that the obligation was an involuntary burden, explaining that the "source of Camilli's obligation to repay the workers' compensation benefits in this case was not her failure to obtain insurance, which might be characterized as a voluntary election, but the statutorily-created obligation to reimburse the Special Fund once the Fund paid benefits to an uninsured employee." *Id.* at 1333. "The obligation to repay the Fund in this case is thus the product of legislative fiat; at the time it arose, and the lien was established, it was wholly beyond the control of the debtor." *Id.* "Payments to an injured employee from the Special Fund 'act as a judgment against the employer,' A.R.S. § 23–907," *Id.* at 1332, which judgment has "'the same priority against the assets of the employer as claims for taxes.' A.R.S. § 23–933." *Id.* The court determined that the obligation to reimburse the ICA for employee compensation paid by the ICA met all four indicia of a tax, and concluded

---

**6.** The Sixth Circuit expanded the *Lorber* test into a six factor analysis in *In re Suburban Motor Freight, Inc. (Suburban I),* 998 F.2d 338 (6th Cir.1993) and *In re Suburban Motor Freight, Inc. (Suburban II),* 36 F.3d 484 (6th Cir.1994) adding the requirements that the

pecuniary obligation be universally applicable to similarly situated entities and that similarly situated private creditors are not disadvantaged by the priority given to the governmental claim.

that the obligation constituted an excise tax for purposes of § 507(a)(8)(E).

Interestingly, the *Camilli* decision, which was decided two months after the excise tax decision of the Supreme Court in *United States v. Reorganized CF & I Fabricators, supra,* did not cite to the Supreme Court decision.

In *Voightman,* the Bankruptcy Appellate Panel determined that unpaid workers' compensation premiums, payable to the state to maintain a state-administered workers compensation insurance plan, constitute excise taxes. As in *Williams* and *Camilli,* the court concluded that the four characteristics of a tax under the *Lorber* test, as well as the additional characteristics described in *Suburban I and Suburban II, see* note 6, *supra,* were met, highlighting the distinction between a fee, which is a voluntary payment for a private benefit, with a tax, which is an involuntary exaction for a public purpose. 239 B.R. at 383.

■ In each of the cases discussed above, the court determined that the assessment at issue qualified as an excise tax. However, in none of the three cases was the concept of the penal nature of the assessment discussed. In *Williams,* the assessment was not issued as a consequence of the violation of a state law, but rather was a charge imposed on drivers who chose not to insure their vehicles in the Commonwealth of Virginia. Virginia does not mandate liability insurance coverage. In *Camilli,* the assessment, which was a consequence of the employer's violation of an Arizona law requiring employers to obtain workers compensation insurance, was actually a reimbursement to the state agency for benefits paid to the debtor's employee, as "part of a complex system designed ... to provide universal availability of workers' compensation benefits to employees in the state." 94 F.3d at 1333. Under Arizona law, the payments made by the state agency act as a judgment, which have the same priority against the assets of the employer as claims for taxes. And

in *Voightman,* the assessment was a worker's compensation premium imposed on employers by the state to maintain a state-administered workers compensation insurance plan. All three cases contrasted a tax, which is an involuntary exaction for a public purpose, with a fee, which is "a commercial charge ... for the privilege of engaging in a certain regulated activity not available to the public generally or for the provision of a service which a person may obtain lawfully from others or may provide himself." *In re Sacred Heart Hosp.,* 209 B.R. 650, 654 (E.D.Pa.1997). In each of the three cases, the court determined that the tax characteristics of the assessment predominated over the non-tax characteristics of the assessment resembling a fee.

**B. Tax Attributes versus Penalty Characteristics.**

The DMV rejects the characterization of the surcharge as a penalty, contending that the surcharge was intended to fund underwriting losses by the JUA, and to fund insurance reform generally, and is therefore more akin to "an enforced contribution to provide for the support of government," then a penalty. *CF & I,* 518 U.S. at 224, 116 S.Ct. at 2113. In *CF & I,* the assessment was determined to be "punishment for an unlawful act." *Id.* In contrast, the DMV highlights the non-punitive nature of the surcharge, described as follows:

[T]he motor vehicle surcharges statutorily imposed upon individuals who violate particular motor vehicle offenses are neither excessive nor punitive in the criminal sense. The purpose of the surcharge is to fund the JUA and to help cover the JUA's deficits. *In re Lugo,* 94 B.R. 335 (D.N.J.1989). The surcharges are recognized to be "civil and remedial, rather than punitive, in nature." *Lugo v. Paulsen,* 886 F.2d at 610.

*In re Kent,* 190 B.R. 196, 203 (Bankr. D.N.J.1995).

■ The DMV is certainly correct that the revenues generated from motor vehicle surcharges provide funding for a comprehensive legislative plan to furnish automobile insurance to persons unable to obtain insurance elsewhere and help to equalize policy rates based on individual driving records. But the incidents of a surcharge resemble a penalty significantly more than a tax. Unlike a tax, the surcharge is imposed only on violators of specified laws, and "seeks to deter drunk drivers [and other violators] by requiring that they make a substantial contribution to a general insurance fund once they are convicted." *Lugo v. Paulsen,* 94 B.R. 335, 336 (D.N.J.), *aff'd,* 886 F.2d 602, 610–11 (3d Cir.1989) (surcharges "arise as a consequence of driving while intoxicated, and therefore may serve to deter drunk driving"). Unlike a tax, the only means of collection for failure to pay a surcharge between 1983 and 1994 was the suspension of driving privileges. The statute was amended in 1994 to allow the DMV director to record a certificate of debt against the violator. Unlike a tax, the collection of the assessment (by filing a certificate of debt and collecting on the debt as if it is a judgment) is discretionary with the director of the DMV, with no statutory guidance provided for the exercise of that discretion. *See Saunders,* 234 B.R. at 565–66 (Imposition of assessment on employer for failing to have worker's compensation insurance was discretionary, thereby disqualifying the assessment from designation as a tax). The consequences of failing to pay the surcharge, including mandatory license suspension and discretionary assessment by the DMV, are different from the assessment and collection processes mandated for state taxes under the State Tax Uniform Procedure Law, N.J.S.A. 54:48–1 *et seq.* Assessments for motor vehicle surcharges imposed by the DMV are payable to the DMV, and are appealable to the New Jersey Superior Court, Appellate Division, while state taxes are generally pay-

able to the New Jersey Division of Taxation, and appealable to the New Jersey Tax Court.[7] The surcharge is not "an enforced contribution to provide for the support of government", *CF & I,* 518 U.S. at 224, 116 S.Ct. at 2113, as the DMV suggests.

The designations of the surcharge in New Jersey case law as "civil and remedial, rather than punitive" *Lugo v. Paulsen,* 886 F.2d at 610, and as "a monetary assessment in accordance with a uniform schedule for the privilege of driving on the highways." *Clark v. New Jersey DMV,* 211 N.J.Super. 708, 711, 512 A.2d 588 (App.Div.1986), do not defeat the characterization of the surcharge as a civil penalty rather than a tax. In *Lugo,* both the district court and the court of appeals recognized the deterrent nature of the surcharge. In *Clark,* the Appellate Division labeled the surcharge as a civil penalty, as contrasted with a criminal penalty. And in *Kent,* I determined that the surcharge is a "penalty" for purposes of 11 U.S.C. § 523(a)(7), declaring nondischargeable a debt for a fine, penalty or forfeiture payable to and for the benefit of a governmental unit, in a definitional sense.

> The Bankruptcy Code does not define the terms "fine", "penalty", or "forfeiture". Black's Law Dictionary (6th Ed.1990) defines a "penalty" as a sum of money which the law exacts payment of by way of punishment for doing some act which is prohibited. *Id.* at 1133. The definition describes precisely what a motor vehicle surcharge is. The surcharge is an assessment which must be paid as a consequence of violations of certain motor vehicle laws.

*In re Kent,* 190 B.R. at 202. The discussion in *Kent* cited by the DMV in its brief that a surcharge is not "punitive in the criminal sense" was aimed at rejecting the double jeopardy argument that the designation of the surcharge as a civil penalty

---

7. The Director of the DMV may refer matters of uncollected surcharges to the Comprehen-

sive Enforcement Program pursuant to N.J.S.A. 2B:19–6, –10.

would constitute successive punishment for the same motor vehicle offense. *In re Kent*, 190 B.R. at 202. The analysis of the import and severity of a civil penalty to determine whether a particular penalty is more akin to a criminal penalty proscribed by the double jeopardy clause is vastly different from the analysis required to ascertain the tax and non-tax characteristics of an assessment imposed as a consequence of a state law violation.

## IV. Conclusion.

With reference to the four-prong *Lorber* test applied in *Williams, Camilli* and *Voightman*, there is no question that the motor vehicle surcharge at issue here exhibits all four characteristics of a tax. The DMV is correct that the surcharge is an involuntary pecuniary burden, properly enacted by the New Jersey legislature, under the police or taxing authority of the state, for a public purpose. *See, e.g., Lugo v. Paulsen*, 886 F.2d 602 (3d Cir.1989) ("the surcharges provided funding for a comprehensive legislative plan to furnish automobile insurance to persons unable to obtain insurance elsewhere and to help equalize policy rates based on individual driving records.")

Nevertheless, in light of the Supreme Court decision in *Reorganized CF & I Fabricators*, we cannot conclude that the surcharge constitutes an excise tax under § 507(a)(8)(E). In its decision, the · Supreme Court expanded the discussion regarding the designation of an assessment as an excise tax beyond the four characteristics of a tax laid out in earlier cases. The import of the *CF & I* decision is that

even though the *CF & I* assessment, the "tax" imposed upon the debtor employer as a consequence of funding deficiencies in the debtor's sponsored pension plans, qualified as a tax, its non-tax characteristics, in particular, the penal nature of the assessment, precluded the designation of the assessment as a tax. The *CF & I* assessment is clearly an involuntary pecuniary burden. Congress properly imposes the penalty upon employers who fail to meet annual pension plan funding requirements, in a valid exercise of its police or taxing power. The public purpose of the 10% "tax" is to deter employers from failing to meet the annual pension plan funding requirements by punishing such employers with a sanction if a violation of the statutory requirement occurs. Notwithstanding qualification of the 10% sanction as a tax under the four prong test, the Supreme Court concluded that the sanction was not a tax under § 507(a)(7)(E), but "a penalty to be dealt with as an ordinary, unsecured claim." 518 U.S. at 226, 116 S.Ct. at 2114.[8]

Similarly, here, notwithstanding the qualification of the motor vehicle surcharge under the four-prong test as a tax, its "non-tax characteristics [as a civil penalty under New Jersey law] predominate over the tax characteristics." *Saunders*, 234 B.R. at 565 n. 12. The motor vehicle surcharge in New Jersey is the negative civil consequence of a violation of certain motor vehicle statutes, imposed only on violators, with a further punitive consequence of the mandatory suspension of driving privileges if the assessment is not paid.[9]

---

**8.** The DMV contends that the CF & I assessment would not meet the "public purpose" prong of the *Lorber* test because the purpose of the assessment "is to penalize the employer's failure to meet the funding standards of the individual pension plan and not to defray the costs of the government or any government undertaking under the Employment Retirement Security Act, ERISA. The PBGC [Pension Benefit Guarantee Corporation] was created for that purpose." DMV Letter, Dec. 8, 1999. The "public purpose" prong of the *Lorber* test is most often juxtaposed against

the private benefit realized by the voluntary payment of a fee. *See, e.g., Williams v. Motley, supra.* The fact that the *CF & I* penalty is not used to defray designated governmental costs does not defeat its public purpose.

**9.** In *Williams*, where the assessment for driving an uninsured vehicle was determined to be an excise tax, the consequence of failure to pay the assessment was also the suspension of driving privileges. However, the assessment was not imposed in connection with a viola-

The non-tax attributes of the surcharge, including the "central idea that significant motor vehicle offenses should be deemed the basis for the imposition of a insurance surcharge," *State v. Bigham,* 119 N.J. at 655, 575 A.2d 868, constituting a civil penalty imposed upon a violation in addition to other motor vehicle penalties, compel the conclusion that the surcharge is not a tax.[10]

The policies underlying the Bankruptcy Code provide further support this conclusion. *See Feiring,* 313 U.S. at 285, 61 S.Ct. at 1029 ("we look to the terms and purposes of the Bankruptcy Act as establishing the criteria upon the basis of which the priority is to be allowed"); *Saunders,* 234 B.R. at 564.

■ Generally, § 507 of the Bankruptcy Code, awarding priority to certain categories of claims, must be strictly construed to protect general unsecured creditors. *U.S. v. TM Bldg. Products, Ltd.,* 231 B.R. 364, 370 (S.D.Fla.1998); *In re Townsend,* 187 B.R. 230, 235 (Bankr.W.D.Tenn.1995); *In re Olson,* 154 B.R. 276 (Bankr.D.N.D. 1993). As the debtor has noted, the 1978 Bankruptcy Code set aside the priority for governmental nontax debts, "plac[ing] the government's nontax claims on a parity with other unsecured claims, unless, of course, the government is secured. The time has past when the sovereign can do no wrong and is entitled to the first fruits of every insolvent estate." Report of the Committee on the Judiciary, House of Reps., To Accompany H.R. 8200, H.R. No. 95–595, 95th Cong., 1st Sess. 194 (1977).

■ Section 507(a)(8), granting priority to certain types of taxes, implements a broad congressional policy against punishing innocent creditors of a debt for the debtor's wrongdoing. *In re Cassidy,* 983 F.2d 161, 164 (10th Cir.1992).

The policy of protecting unsecured creditors from the bad conduct of the debtor is best implemented by avoiding burdening the claims of unsecured creditors with penalties that are imposed on the debtor.... "If the purpose of this additional tax is [deterrence] ... and everybody agrees that that's the purpose, then the deterrent effect will be diminished, at least, if not lost, by having the creditors rather than the taxpayer be the one to actually in the end pay ... in other words, the debtor does not bear the sanction as much as the unsecured creditors."

*Id. See also In re Unified Control Systems, Inc.,* 586 F.2d 1036 (5th Cir.1978) ("'Enforcement of penalties against the estates of bankrupts ... would serve not to punish the delinquent taxpayers, but rather their entirely innocent creditors.'") (quoting *Simonson v. Granquist,* 369 U.S. 38, 40, 82 S.Ct. 537, 538, 7 L.Ed.2d 557 (1962)); *Mounier,* 232 B.R. at 190–91 (quoting *Cassidy*). While motor vehicle surcharges are clearly civil penalties and remedial in nature, they do serve a purpose of deterrence. *See Lugo v. Paulsen,* 886 F.2d 602, 610–11 (3d Cir.1989) ("We recognize that Merit Rating Plan surcharges are civil and remedial, rather than punitive, in nature. Nevertheless, they do arise as a consequence of driving while intoxicated, and therefore may serve to

tion of a state law, but was universally imposed on all uninsured drivers.

**10.** Compare the motor vehicle surcharge with the temporary assessments imposed by the New Jersey legislation for the privilege of practicing certain professions and occupations (including lawyers, doctors, physical therapists and automobile body repair facilities). *See, e.g.,* N.J.S.A. 17:33B–58 through 62. The temporary assessments were designed to provide additional revenue sources to satisfy the outstanding debts of the JUA,

which also receives revenues from surcharges collected by the DMV. The assessments were imposed on specified classes of professionals or occupations, without regard to their connection with the automobile insurance industry, and without regard to any violations committed by the individual, solely for the purpose of raising revenues for a public purpose. *See New Jersey State Bar Ass'n v. Berman,* 11 N.J.Tax 433 (Tax Ct.1991), *aff'd in part, modified in part,* 259 N.J.Super. 137, 611 A.2d 1119 (App.Div.1992).

deter drunk driving."); *In re Lugo,* 94 B.R. 335, 336 (D.N.J.1989) ("The state law seeks to deter drunk drivers by requiring that they make a substantial contribution to a general insurance fund once they are convicted."). Concluding that the motor vehicle surcharges imposed against the debtor are excise taxes entitled to priority treatment would unfairly elevate the State's claim against the debtor, and serve not to punish the debtor, but rather his innocent creditors.

Debtor's objection to the proof of claim filed by the DMV, designating its claim as a priority claim, is sustained. The claim will be reclassified as a general unsecured claim. Debtor's counsel shall submit a form of order in conformance herewith.